FILED
CLERK
2/7/2025 8:45 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| iROBOT CORPORATION | * | Case No. 23-CV-00580(JMA) |
| Plaintiff, | * | Long Island Federal Courthouse |
| | * | 100 Federal Plaza |
| v. | * | Central Islip, NY 11722 |
| EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., | * | January 14, 2025 |
| Defendant. | * | |

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff: MATTHEW F. DIDORA, ESQ.
JOHN S. CAHALAN, ESQ.
Law Office of Matthew F. Didora, P.C.
377 Oak Street, Suite 203
Garden City, NY 11530

For the Defendant: DAVID H. PIKUS, ESQ.
Bressler, Amery & Ross, P.C.
17 State Street
New York, NY 10004

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

(Proceedings commenced at 11:58 a.m.)

THE CLERK: Calling 23-CV-580, iRobot Corporation vs. Expeditors International of Washington, Inc.

Please state your appearances for the record.

MR. DIDORA: Good morning, Your Honor. Matthew Didora and John Cahalan from the Law Office of Matthew F. Didora, P.C. And with us today in the courtroom is Amy Witts, who is the Associate General Counsel of iRobot.

THE COURT: Good morning.

MR. DIDORA: Good morning.

MR. PIKUS: Good morning, Your Honor. David Pikus, P-I-K-U-S. I'm with Bressler, Amery & Ross, P.C., representing the defendant, Expeditors International of Washington, Inc.

THE COURT: Good morning. So you're here because of a discovery dispute that apparently could not be worked out. This is in -- I don't know how many there have been in the past, but there have been several. And now all the time is over for fact and expert, but now I see you still have problems.

Let's start at the beginning with what the case is about.

So this is a breach of contract case, right? And essentially what iRobot is saying is there was this cyber attack everyone agreed had happened. Everybody agrees that

the defendant -- tell me if I'm wrong -- halted all shipments. Is that right?

MR. PIKUS: Your Honor --

THE COURT: At a certain point because of the attack?

MR. PIKUS: -- I wouldn't say that they halted all shipments, but they shut down their electronic system for a specific period of time.

THE COURT: Right.

MR. PIKUS: But there were certain shipments that the plaintiff admits were continued. And we had a business continuity plan that would have permitted us to shift over to a manual system. And this has nothing to do with the present discovery issue.

THE COURT: Well, everything does.

MR. PIKUS: But the plaintiff decided not to avail itself of that and to take its own course.

THE COURT: Okay. And it does have to do with this case though, because the case, at the end of the day, is a breach of contract alleging that the defendant didn't do enough I guess to sort of plan for this eventuality, right? Or have continuity, to use their phrase, and plan, right?

MR. DIDORA: Absolutely, Your Honor. That's certainly a component distilled to its core. Expeditors was supposed to provide third-party logistic services to iRobot.

When it was the victim of the cyber attack, it literally flipped the switch and shut down its global operating system.

THE COURT: And when you say it's a component, it's a breach of contract case, right?

MR. DIDORA: One hundred percent.

THE COURT: So how did they breach their contract?

MR. DIDORA: In multiple ways, one of which is they didn't have the contractually obligated business continuity plan to continue providing the services that they were contractually obligated to provide. That's number one.

And number two, they couldn't provide logistic services anymore because they shut down the system. Right? A business continuity plan necessarily contemplates continuation of the business activity.

THE COURT: Right. So that's all part of the plan, right?

MR. DIDORA: Yes. When they shut --

THE COURT: So you had a contract with them. And did the contract have a provision that says that they would have that plan, or --

MR. DIDORA: Yes. They were required to have a business continuity plan. They shut down their systems when they became aware of the attack. We were -- they could not provide any of the logistic services anymore.

In fact, correspondence that was just produced to

us in November, for the first time, after the close of fact discovery, from their IT experts, and their president and CEO, acknowledge, in black and white, we cannot provide services to our customers at this time. So, you know, there was a complete and total shut down. They couldn't -- iRobot was completely detached from its inventory. It couldn't meet customer demand. It didn't know what was going on.

THE COURT: So you had to make different arrangements and --

MR. DIDORA: That's exactly right.

THE COURT: -- gets things done.

MR. DIDORA: We had to take our -- we had to take our product that was with Expeditors and move it to a new logistics provider so that iRobot could continue its business and meet its customer orders.

THE COURT: Right. And was that product that was already in the defendant's supply chain or --

MR. DIDORA: It was in the defendant's warehouses in --

THE COURT: -- it just didn't start? Okay.

MR. DIDORA: -- various locations throughout the country. We had to go, physically go to the warehouse with trucks, load all the inventory onto the trucks --

THE COURT: Right.

MR. DIDORA: -- and move it to new providers.

THE COURT: And that's all your damages? And you've already given them, you know, as far -- as far as facts go, you've already given all of that. I'm sure the parties have taken care of all of that.

MR. DIDORA: Correct.

THE COURT: What we're here on today are areas where you say the defendants either produced things late or, you know, didn't produce them at all, or are over-designating things in terms of confidentiality.

So the first part of your -- of your motion here talks about failure to search relevant custodians. And in your letter, I think you set forth eight people that you say that they never even searched those people's files, right?

MR. DIDORA: Correct.

THE COURT: Okay. So let me ask the defendant have you -- did you conduct searches of those files or those files that should have been searched?

I know that in your letter that you say, well, look, those eight people that were mentioned, you know, thousands of times in your documents so they should know about them. The narrower question that I have is did you search their files, and did you have to?

And you could stay seated because, like I said, the microphone is important. Some lawyers can't stay seated. I get that. But I just want you to be comfortable.

MR. PIKUS: Thank you, Your Honor. I appreciate that.

THE COURT: Okay.

MR. PIKUS: And may it please the Court, I'm going to answer your question directly. And that I hope you will indulge me in a --

THE COURT: Sure.

MR. PIKUS: -- further explanation that's directly relevant.

The answer is, you know, I personally didn't conduct the searches, but the client did search the ten individuals whose names were set forth in our September 12th, 2024 letter.

In addition to that, any material documents that would have related to these other seven or eight individuals, there was a little bit of overlap there were produced --

THE COURT: Okay.

MR. PIKUS: -- in one fashion or another. Either they were searched generally or they were searched specifically. But we're very confident, and I've been told, that anything that relates to any of the ten individuals on our list and the seven or eight that they claim weren't searched had been produced. That's what I've been told. And I --

THE COURT: Okay.

MR. PIKUS: -- have every reason to believe so because we've produced over 112,000 pages of documents.

And then if the Court will indulge me a little bit with --

THE COURT: Sure.

MR. PIKUS: -- an explanation here, I've been trying, since the beginning of discovery, to do, what I've always done in large federal court cases, and that's to confer with my adversaries and try to reach agreement on search terms and custodians.

And I began that process with plaintiff’s counsel at the very beginning of 2024. And then, Judge, everything that I'm telling you I can back up with documents and correspondence.

THE COURT: I have no reason to think that you can't, so.

MR. PIKUS: Okay. I appreciate that.

THE COURT: Yeah.

MR. PIKUS: So I actually sent draft search terms to counsel at the beginning of February of 2024. I heard absolutely nothing. We then had a discussion a couple of months later, when I reminded counsel that I was still waiting for the search terms, and counsel said, well, you know, regarding agreement with all of them, we may want some more. So I said fine. You know, tell me what else you want.

THE COURT: And that's search terms with respect to electronically stored information, right?

MR. PIKUS: Primarily, yes.

THE COURT: Yeah.

MR. PIKUS: But everything that they would want would be stored electronically in one form or another. Either it would be in an original Excel spreadsheet or it would be in PDF, so we would have picked up everything. There is practically nothing in paper here that wasn't also created in some fashion at some point electronically.

THE COURT: And is that in any way different from them saying to you I want all communications regarding this, and you saying, well -- was there sort of a back and forth where you say, well, all communications is too much. Why don't we do search terms or something like that. Is that what happened?

MR. PIKUS: Well, we think at the end of the day everything that the plaintiff would reasonably need was produced. As I said, over 112,000 documents done in ten different productions.

And any time that plaintiff’s counsel approached us and said, well, we don't think you produced this or we don't think you produced that, we went back to the client and the client did an additional search. So we're very confident that everything was produced.

But turning back to the search terms, which really would have done the trick here --

THE COURT: Well, it's and custodians, right?

MR. PIKUS: Right.

THE COURT: Because they're talking --

MR. PIKUS: Yeah.

THE COURT: -- they're focusing on people?

MR. PIKUS: Search terms and custodians.

THE COURT: Right.

MR. PIKUS: Correct, Your Honor. Absolutely correct.

So then late in the spring, maybe early summer, one of the other attorneys in plaintiff's firm followed up, after we hadn't heard anything for a while, and said, listen, you know, we still think you haven't produced all the documents. And I said, well, you know, tell me what documents you think are still outstanding. Try to be specific about it.

But also I've been waiting since February to get some reaction to our search terms and I still don't have anything. So counsel said, well, would you please send me the search terms even though I had sent them to his partner six months, five-six months earlier.

So I immediately obliged. I sent the search terms. Again, we got no response, no additional search terms, nothing.

So then in August, I sent a letter to counsel because we were still engaged in conversations. I sent a letter to counsel and I said, you know, we still need to do this. We need to agree on search terms. We need to agree on custodians. We had a little interchange about custodians. And I said I tell you what. I'll send you a list of the people that we think are the primary custodians to be searched --

THE COURT: So when we're talking about custodians, are we talking about employees of your client? People --

MR. PIKUS: Correct.

THE COURT: So they're people that are employees. They're within your control.

MR. PIKUS: Exactly.

THE COURT: What do they have to have custodians? Why don't you just respond and give them what they asked for? Why is it limited by, you know, people's files?

MR. PIKUS: Well, if we had to go to all 18,000 employees, Your Honor, we wouldn't complete fact discovery probably until 2028. So, you know, it's been my experience in any case of this magnitude, and it certainly was clear here --

THE COURT: Okay.

MR. PIKUS: -- where there are potentially millions of documents, that this was the way to go. And by the way,

there was never any objection to it.

THE COURT: Right.

MR. PIKUS: And I'll add, you know, counsel and I have a good working relationship.

THE COURT: Do you?

MR. PIKUS: We do. I mean, we haven't solved problems, but --

THE COURT: It's hard to get that from --

MR. PIKUS: -- but this -- well, you know, you see cases where there's a toxic personal relationship between the lawyers --

THE COURT: Okay.

MR. PIKUS: -- that's not true here. We have a lot of disagreements about how to practice, but there's nothing toxic. We talk to each other.

THE COURT: Okay.

MR. PIKUS: We have conversations.

THE COURT: All right. So I'm getting -- and I see that there was a back and forth on search terms, and they were or were not supplied, but where we are today, in this case is, you know, a couple of years already, right?

MR. PIKUS: It will be shortly.

THE COURT: Right. So where we are today, you're saying to me that you have searched all that is necessary. And while you can't say to me that you've identified those

however eight or ten people that are identified now, that those are people that -- whose names were out there and you're confident that they were searched or that everything has been responded to?

MR. PIKUS: That their documents have been produced. Anything that bears on this case. Other than, gee, I'm not going to be at work tomorrow morning, contact me again on Wednesday, we tried to sort those out.

THE COURT: And that's with -- and that's true with respect to any employee that had anything to do that's within the scope of discovery in this case?

MR. PIKUS: Well, you know, to be perfectly frank with you, Your Honor, the way you pose that question, every one of Expeditors' 18,000 employees worldwide was affected in some way --

THE COURT: Right. They all -- they --

MR. PIKUS: -- by this cyber attack.

THE COURT: They knew about it. They were affected by it.

MR. PIKUS: Right.

THE COURT: But the scope of this case, as you point out, can't possibly be that broad because it would be widely disproportionate, right?

MR. PIKUS: Yeah. And --

THE COURT: So what we're talking about is this

client, iRobot, when we're talking about their contract, and we're talking about whatever plan you had in place to deal with the cyber attack?

MR. PIKUS: That's right, Your Honor. And I'll drop a footnote here to say that even though the plaintiff has pleaded $2.2 million in damages in its complaint because of contractual limitations of liability that have been upheld countless times, not just for our client, but in the 3PL industry in general, the real damages here are only approximately $40,000. Those are the --

THE COURT: Have you made any motion to limit damages in that way?

MR. PIKUS: Well, we plan to make a summary judgment motion -- and that's one of the reasons, Your Honor, why we respect your decision, which you've now made three times -- you've been very generous to the parties to end fact discovery -- and why we want to proceed with our summary judgment motion. And you said that --

THE COURT: And is your summary judgment to be a limitation of liability to 40,000? Or will it be you're not liable? Because if it's the two parts, and you're telling me this $40,000 is pretty clear, why don't you make that motion?

MR. PIKUS: Well, we do plan to make both because we have other defenses. We have force majeure defense, which is probably the first thing Your Honor thought about when you

read the pleadings here. We do have a force majeure defense because of this unprecedented cyber attack. This is what the experts call a zero day attack, meaning it's a type of malware that has never been utilized before and confounded even the greatest of experts. We --

THE COURT: And you have that in your -- in your contract?

MR. PIKUS: Yes. Yes. And, you know, I don't want to digress too much from the issues at hand --

THE COURT: Right. I'm just --

MR. PIKUS: -- but --

THE COURT: The case is worth $40,000?

MR. PIKUS: Yeah. And that's why when Your Honor echoed or mentioned the words proportionality --

THE COURT: Proportion, yeah.

MR. PIKUS: -- it caught my ear right away.

THE COURT: But even at two million proportional --

MR. PIKUS: That's right. That's right. We can't --

THE COURT: -- it's we're still at --

MR. PIKUS: Yeah.

THE COURT: -- thousands of pages to use an opportunity.

MR. PIKUS: So if I can return back --

THE COURT: You know, while you're at it, talk to

me a little bit about the 30(b)(6) deposition.

Actually, I'm going to go to the other side on that. On the 30(b)(6) deposition, I'm assuming you served the other side with a notice of deposition that outlines the areas that you wanted this witness to talk about?

MR. DIDORA: Of course, Your Honor, Yes.

THE COURT: Okay.

MR. DIDORA: Yes, we did.

THE COURT: And did you ever go back and say, look, this guy wasn't available to talk about these things and, therefore, we need somebody else?

MR. DIDORA: No. We didn't. And could -- we didn't at that time. We didn't have a problem with the 30(b)(6) witness that was produced by Expeditors.

THE COURT: Okay.

MR. DIDORA: The problem that we have today is the fact that Expeditors produced a thousand pages of highly relevant, responsive documents to us for the very first time on November 14th, six weeks after the close of fact discovery, and long after we deposed the 30(b)(6) witness.

These are documents that -- they're not just relevant, they're among the most highly relevant documents that we requested from Expeditors. They include things such as an 80-page report from Mandiant, which was hired by Expeditors for the specific purpose of identifying the source

and scope of the attack and providing information on the perpetrators of the cyber attack. It includes a document entitled Business Continuity Plan from the Salt Lake City office. It includes internal correspondence between Expeditors' employees and executives regarding the cyber attack.

For example, one of which is the very first email where the C Suite level of employees were notified of the cyber attack and what had been done in response to it. The system shutdown were Expeditors', you know, could no longer continue providing logistics services. It includes other, you know, all internal correspondence about what is being done. The thousand pages includes steering committee meeting minutes.

Now, this -- in response to the cyber attack, Expeditors convened two groups. An incident response team and a recovery steering committee.

And the focus of these two groups was to respond to the cyber attack, including getting the -- Expeditors' systems back online which didn't happen as quickly as the shutdown did. The shutdown was seemingly a flick of a switch. The recovery and getting back online was something that happened over days and weeks and seemingly months where --

THE COURT: Well, I'm sure they would tell you that

that makes sense.

MR. DIDORA: Certainly. It may make sense. I'm not saying it doesn't make sense.

THE COURT: Right.

MR. DIDORA: I'm just saying that that is what has come out in discovery after the close of fact discovery. And these documents -- you know, Expeditors likes to pat itself on the back and say we produced over 100,000 pages of documents. They produced 100,000 pages of nonsense, only 10,000 of which were at all were relevant.

And the best example of that is the initial production, which they champion as largely responsive to everything that we asked for, not one of those documents was relied upon by either one of their experts. It was 100,000 pages of nonsense, 10,000 pages that they produced over months. After we pointed out to them, hey, you didn't give us anything, they produced 10,000 over the course of months.

THE COURT: What's nonsense? Give me an example of what's nonsense?

MR. DIDORA: Bills of lading for products that had been ordered, you know, through iRobot or that, you know, iRobot orders before the cyber attack. There were tens of thousands of pages of these order confirmations --

THE COURT: And these orders that were already delivered before?

MR. DIDORA: Done. Over and done with. Yeah. That they had nothing to do with shipments that weren't going out.

THE COURT: And did you limit your discovery request only to shipments that didn't go out?

MR. DIDORA: We didn't ask for shipments that went out. Yeah. I mean --

THE COURT: What did you ask for?

MR. DIDORA: -- Expeditors had said that, oh, we asked for the contract between Expeditors and iRobot, so these documents reflecting shipments that went out are contracts between Expeditors and iRobot. But we didn't need that stuff. It had -- it was relevant to nothing.

THE COURT: Did you talk about that, and you worked that piece out?

MR. DIDORA: We did. And that's when they started producing other stuff afterwards.

THE COURT: Right. But now we're talking about --

MR. DIDORA: And that --

THE COURT: -- a thousand pages, right --

MR. DIDORA: Right.

THE COURT: -- that you say include -- that's what we're talking about now?

MR. DIDORA: We're talking about a thousand pages -

THE COURT: A thousand pages that include this -- what is it Mandiant --

MR. DIDORA: The full -- the Mandiant report internal --

THE COURT: -- that report, and steering committee.

MR. DIDORA: The steering committee meeting minutes.

THE COURT: And other than that --

MR. DIDORA: Internal --

THE COURT: -- because those two they have addressed in the letter, but go ahead.

MR. DIDORA: Internal correspondence.

THE COURT: When you say thousands --

MR. DIDORA: Well, it would --

THE COURT: -- is it those two or is it more than that?

MR. DIDORA: It's a thousand pages of documents that were given to us for the first time on November 14th. We had never seen those documents before.

THE COURT: Okay. And are they -- do they disclose new people? Or what do they talk about, those documents?

MR. DIDORA: They discuss a wide variety of things. You know, the Mandiant report, for example. So Expeditors had all these --

THE COURT: The Mandiant report, was that relied on

by an expert?

MR. DIDORA: Yes.

THE COURT: Okay.

MR. DIDORA: It was.

THE COURT: So that would be -- have been part of your expert discovery to talk about that?

MR. DIDORA: It would have. But we -- we don't -- we think it was a fact document as well. Because there's another litigation pending in Washington --

THE COURT: Yeah. I don't want to talk about the other litigation. And I --

MR. DIDORA: But --

THE COURT: You have it now. I'm just trying to --

MR. DIDORA: Right.

THE COURT: -- try to figure out whether, you know, is this something that was probably produced as part of experts? Should it have been part of fact? You say it should have been part of fact. They say they were holding these things back as privileged. But in the end, they gave them to you.

MR. PIKUS: Right.

THE COURT: They gave you the Mandiant report and they gave you the steering committee notes. But you're saying that you didn't get more than that.

MR. DIDORA: No.

THE COURT: And to -- is the more than that within the scope of your breach of contract claim that it was a business continuity issue?

MR. DIDORA: We're focusing on the thousand pages that we got on November 14th.

THE COURT: Right.

MR. DIDORA: Yes. We acknowledge we have them.

THE COURT: Right.

MR. DIDORA: What our -- what our gripe is, our gripe is that those thousand pages should have been given to us well prior to the close of fact discovery so that we could --

THE COURT: So now that you have that, what would you want to do? Would you want to notice a different 30(b)(6) person? Would you want another deposition?

MR. DIDORA: We want -- yeah. We want to go back to the 30(b)(6) witness so that we could --

THE COURT: Same witness, and ask them about these documents?

MR. DIDORA: Those thousand pages of documents. Correct.

THE COURT: Okay.

MR. DIDORA: Correct.

THE COURT: And that's it? Because you said you only want a 30(b)(6)?

MR. DIDORA: That's exactly right.

THE COURT: And that's all you want?

MR. DIDORA: We are content going back to the 30(b)(6) witness given his -- I understand he's no longer with Expeditors, but given his role with Expeditors at the time of the events, you know, covered by the documents, we would be content with going back to that 30(b)(6) witness.

THE COURT: When did you depose him?

MR. DIDORA: That was --

MR. CAHALAN: September 27th, Your Honor.

THE COURT: So you're saying you deposed him on September 27th, and about a month later, less than a month later, you got more documents?

MR. DIDORA: Two months later.

MR. CAHALAN: Yes. Say two months, Your Honor.

THE COURT: November?

MR. DIDORA: November.

THE COURT: I'm sorry. Two months. Two months later you got all those documents. And you're saying at that time you didn't have a chance to talk to the 30(b)(6) witness about those documents?

MR. DIDORA: Correct, Your Honor.

THE COURT: Okay.

MR. DIDORA: Yes.

THE COURT: And that's it?

MR. DIDORA: Yes. That's on the thousand pages.

But if I could just touch upon the custodians for a minute? On September 12th, counsel sent us a letter that identified ten people that were the custodian -- the custodians that were searched. That was six -- 18 days before the close of fact discovery. It only listed ten people.

THE COURT: Did he get in touch with you, as he said, back and forth, for it sounded like months before saying, hey, I want search terms? Maybe your colleague knows that?

MR. DIDORA: No.

THE COURT: I guess I want search terms. I want custodians? Did you get back on that?

MR. DIODORA: Yes. Counsel and I had conversations about search terms. We could not -- we didn't agree upon search terms.

THE COURT: And that was -- when was your first conversation when you didn't agree on those things?

MR. DIDORA: I don't remember. But I want to say it was probably the fall of '23.

THE COURT: No motions from that time?

MR. DIDORA: No motions from that time. And discovery proceeded. We never heard --

THE COURT: Right. It was -- proceeded without

motions.

MR. DIDORA: And without search terms.

THE COURT: And now we're talking about it. But it proceeded. And nobody made a motion.

MR. DIDORA: Nobody made a motion about the need for search terms at that time, no.

THE COURT: Right.

MR. DIDORA: And also, you know, one of the other gripes that we had is our ability to have a meaningful conversation about the custodians that Expeditors, you know, would have had to search was limited because Expeditors withheld from us the names of key witnesses.

Again, going back to this -- the recovery response team and the steering committee, the two committees that were formed for the purpose of responding to this cyber attack, one would think if Expeditors was being forthcoming in their discovery request they would have identified the members of those two committees in its initial disclosures. We didn't --

THE COURT: Do you question their position that those names were within documents, listed thousands of times, those names were there, or no? I feel like your colleague wants to answer.

MR. DIDORA: Sure.

MR. CAHALAN: I can speak to that. So part of what

they say in their letter, and part of what Mr. Pikus is saying now is, well, we produced these documents. They didn't search one individual custodian as best I can tell for the first 102,000 pages they produced.

The first time that they searched an individual custodian was after we discussed this in July. And I said Mr. Pikus we don't have any of the relevant documents that relate to the cyber attack.

All they produced in their initial 102,000 pages were invoices, bills of lading. What they did not produce were communications with the cyber attackers, internal communications at the time of the cyber attack, communications as to getting their backup tapes back on line.

THE COURT: But then they did produce them when?

MR. CAHALAN: Well, the first meaningful production of documents that related to any type of email communications was on August 27th, 2024. We served our initial request for documents in this case in June of 2023.

THE COURT: Yes.

MR. CAHALAN: They didn't produce one relevant email until the end of August, which was more than a month after the extended fact discovery deadline --

THE COURT: Yes. And during that period of time, you were -- your side certainly wasn't shy about coming to the Court. There was no evidence that you conferred. But

then you conferred. And time and again, it was worked out. And time and again, I extended discovery. And there was never a motion on search terms and custodians. I'm hearing that for the first time now. So I'm not hearing about that anymore. That's over. Okay?

I want to talk about the last piece of your letter, and that's about designating certain things as highly confidential.

Now, it seems that they've taken their expert report -- and if what you're saying to me is true -- is they took that whole report and put it in this highest level of highest confidentiality which sounds like it would impede your ability to handle it and to show it to employees.

It also seems from their letter that you're trying to work out who can see it. Now, certainly just putting an expert report in and saying here's our expert report, but no one can see it is untenable, right? It has to be a report where the plaintiffs can show it to people.

And maybe it's confidential, and they sign confidentiality agreements, but they have to be able to review it with key employees or their experts and people who know what it's talking about.

So have you talked about, you know, broadening the scope or identity of people who can look --

MR. DIDORA: Yeah.

THE COURT: -- at this report or other documents?

MR. DIDORA: There are -- there are two reports, two expert reports, that Expeditors produced that are covered with this highly confidential designation.

There are also other documents that are designated highly confidential, documents that were produced in discovery and interrogatory responses. And we frankly do not believe that any one of those documents meets the standard for highly confidential that sets forth in the protective order.

THE COURT: In the order.

And let me tell you something else on defendant's side. If you're going to be making a motion for summary judgment and you're using any of these documents, unless it is -- I'll tell you right now -- unless that is highly sensitive business information that you are able to seal from the public, once you move for summary judgment just keep in mind most of this, if it's considered by a court, becomes a judicial document and will be out there on the docket.

So I'm directing that you reconsider this highly confidential designation, which you are allowed to use, but should be used more judiciously than saying, well, everything is stamped highly confidential. You all have to talk about that and try to work that out, because I don't want to see any more motions on that. That's a kind of thing you should

be able to work out. It has to be something that can be looked at, and evaluated, and responded to by people who need the information.

And as I said, if you're going to be moving for summary judgment on any of those, there's going to have to be a big -- a showing before there's any sealing. So I'm just putting that piece out there for you to talk about.

Let me ask the plaintiff. What do you say about the $40,000 being an issue and not two million?

MR. DIDORA: The litigation of liability clause that Expeditors has, you know, talked about for some time now, we're not worried about. By the clear language of it, it doesn't apply to the damages that we've incurred in this -- in this case, so.

THE COURT: I mean, I hope not. Because it's a diversity case, and $40,000 wouldn't get you there.

MR. DIDORA: I'm quite confident we will retain -- that this court has jurisdiction over iRobot's case.

THE COURT: Okay. You don't think that that $40,000 is not something. Have you discussed that --

MR. DIDORA: Yes.

THE COURT: -- with the other side at all?

MR. DIDORA: Yes, we have. And we're quite confident that the plain language of that clause does not apply to our damages here. Just like we're quite clear that

the force majeure clause in the distribution agreement, which does not include a cyber attack trigger, does not apply to bar any of our claims.

THE COURT: I'm curious about the limitation of liability, just why it doesn't apply?

MR. DIDORA: The language of -- the language of it. It talks about damages in -- it's a limitation for damages caused by delays in delivery, and our case is predominantly not about delays in delivery. It's about the fact that Expeditors couldn't do anything for us, and we had to go take our units and move them elsewhere. It's not delays. It's labor costs of moving our product.

THE COURT: Incurred because of the delay?

MR. DIDORA: Not a delay. There was --

THE COURT: It's the ultimate delay.

MR. DIDORA: There was a --

THE COURT: It's a stop.

MR. DIDORA: There was a shutdown. They couldn't work.

THE COURT: I don't know. I don't know. I was just curious about that because that's a big difference, right?

MR. PIKUS: I hope they make that argument, Judge. I really do.

THE COURT: Well, I'm -- I'm sure they will. You

know.

That's up to you. And that will be -- that will be made before the district court, right?

MR. PIKUS: May I be heard on the highly confidential designation issue?

THE COURT: No. You're going to continue to talk about that.

MR. PIKUS: Okay.

THE COURT: I don't need to talk about that anymore.

MR. PIKUS: Yeah.

THE COURT: All right. We're not talking about that.

MR. PIKUS: I was just going to say we reached an agreement on that actually.

THE COURT: Well, if you reached an agreement, he would have said we reached an agreement, we don't have to talk about it. Yet, he was talking about it. So I feel like you haven't reached an agreement.

MR. DIDORA: That's right.

THE COURT: If you have, great. Then there's nothing more to talk about.

MR. PIKUS: We did, but they won't honor it. That's the problem.

MR. DIDORA: That's not true.

THE COURT: All right. Well, that means you have to keep talking about it --

MR. DIDORA: That's not true.

THE COURT: -- and figure it out. But you have a great relationship.

MR. DIDORA: I heard.

THE COURT: So you're talking about that. We're not talking any more about custodians or search terms because that's over. Nobody made a motion within the time.

I will extend all discovery, and that's fact and expert, because frankly I can't tell which bucket this falls into. I'm going to give you 30 days more to take a renewed deposition of the 30(b)(6) witness if that witness is still available to this defendant. If they're not, find somebody else.

And the limitation will be on whatever these thousand pages are, that's what the deposition is about, nothing more. Get it done in 30 days. You can do it remotely. You can do it person. However you've been doing things is fine with me. But that's all. No other -- no other extensions. Okay?

MR. PIKUS: Your Honor, may I --

THE COURT: And that will extend the time for making any dispositive motions with the district court. You'll have to do that.

MR. PIKUS: Okay. May I raise an issue, Your Honor, if we're going to reopen discovery?

THE COURT: It depends. What's the issue?

MR. PIKUS: We had -- at the close of discovery, we had 28 categories of documents that, despite lengthy communications between counsel, the plaintiff refused to produce. And these were very basic documents. And plaintiff's argument at the end of that period when discovery ended on September 30th was too late, discovery is over. So we didn't press the point because we took --

THE COURT: Well, you didn't press the point.

MR. PIKUS: -- Your Honor seriously.

THE COURT: And it's not in these letters either.

MR. PIKUS: No. But their excuse was that discovery is over. If it's being extended, we would like to have the plaintiff produce these 28 categories of documents that they withheld. They also refused to produce their own 30(b)(6) witness --

THE COURT: And no. This happened when? When did they refuse to produce a witness? Had you -- had you noticed a witness for deposition --

MR. PIKUS: Yeah. Well, what happened here --

THE COURT: -- to appear within the --

MR. PIKUS: -- Your Honor --

THE COURT: -- within the time period? Had you

noticed a witness --

MR. PIKUS: Yes.

THE COURT: -- from them?

MR. PIKUS: Yes. And we had an agreement that the witness would be produced, but --

THE COURT: When?

MR. PIKUS: This was in September.

THE COURT: Okay.

MR. PIKUS: This is the problem that came up. The key witness in this case was a former employee of plaintiff by the name of Charlie Kirol who was their senior vice president and who was basically in charge of their response to all of this. Mr. Kirol was let go by iRobot a few months before discovery closed. It turns out Mr. Kirol is an admiral in the United States Naval Reserve and he was deployed on the dates that we had noticed for his deposition.

THE COURT: What dates did you notice for his deposition?

MR. PIKUS: It was mid-September. And then we had --

THE COURT: 2024?

MR. PIKUS: I think it was the 19th. And then I think we may have moved it up a week. And he then had a doctor's appointment when he got back from his deployment. So we moved him. And we wanted to switch the date that had

been agreed to for iRobot's 30(b)(6) witness into the slot for -- that was previously reserved for Admiral Kirol and they refused to do it.

And then discovery ended on the 30th. We said, look, you know, you have to produce this guy. You know. Admiral Kirol is out doing the nation's business. You know, that's certainly the best excuse I've ever heard for producing discovery.

THE COURT: Did you notice him or you noticed the 30(b)(6)?

MR. PIKUS: No. We noticed both Mr. Kirol and a 30(b)(6).

THE COURT: Two depositions?

MR. PIKUS: Two depositions.

THE COURT: And you didn't take either of them?

MR. PIKUS: No. We took Mr. Kirol. But they never produced their 30(b)(6) witness.

MR. DIDORA: Your Honor --

THE COURT: What do you say?

MR. DIDORA: -- Mr. Kirol was deposed. The first time we got a 30(b)(6) deposition notice from Expeditors was on September 25th or 26th, four or five days before the fact discovery cutoff date.

THE COURT: Was that after Mr. Kirol was deposed?

MR. DIDORA: I believe so, yes.

MR. CAHALAN: No. Actually --

THE COURT: Mr. Kirol --

MR. PIKUS: No. Mr. --

MR. CAHALAN: -- just to clarify --

THE COURT: By the way, Mr. Kirol is this admiral we're talking about, right?

MR. DIDORA: Yes. He was a former employee of --

THE COURT: Mm-hmm.

MR. DIDORA: -- of iRobot.

THE COURT: And did you identify him as your corporate representative on the 30(b)(6) as the person of knowledge?

MR. DIDORA: He's no longer employed by iRobot at that point.

THE COURT: No. But did you identify him as speaking on behalf of the company as the person with knowledge, or what?

MR. DIDORA: We did not, no. But I will say the reason that the notice was rejected when it was served on either September 24th or September 25th, which was noticed for September 30th, was it contained I believe -- and, again, I'm speaking a little bit off of memory here but I think it was 30-something topics and we said we can't designate a 30(b)(6) to be completed within that time. Just a note, Your Honor. That was in September.

THE COURT: That was in September.

MR. DIDORA: The first time that this is being raised.

THE COURT: I'm hearing about this now.

MR. DIDORA: Yes. Correct.

THE COURT: No motion was made in the time. I'm not opening discovery for that. I'm opening discovery for the one issue that I mentioned on the record. That's it.

UNIDENTIFIED: Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings concluded at 12:36 p.m.)

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Christine Fiore

______________________________ February 3, 2025

Christine Fiore, CERT

Transcriber