**EXHIBIT 5 TO MOTION TO SEAL**

(Plaintiff's Exhibits P, Q)

Should Be Partially Redacted

# EXHIBIT P

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

iROBOT CORPORATION,                )
                                   )
            Plaintiff,             )
                                   )
v.                                 )  Docket No.
                                   )  9:23-cv-00580 (AYS/JMA)
EXPEDITORS INTERNATIONAL OF        )
WASHINGTON, INC.,                  )
                                   )
            Defendants.            )

DEPOSITION UPON ORAL EXAMINATION

OF

CHRIS McCLINCY

** AWAITING CONFIDENTIAL DESIGNATIONS **

Taken at 3545 Factoria Blvd. SE, Suite 300

Bellevue, Washington

DATE TAKEN:    September 24, 2024

REPORTED BY:   KATHLEEN HAMILTON, RPR, CRR, CCR 1917
               California CSR 11595

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 74

Q.   Do you see that?

A.   Yes, sir.

Q.   What does that mean to you?

A.   Cybersecurity is an iterative process where risks are consistently changing, rapidly in many cases. So organizations need to assess, identify where corrective action is needed, and then apply corrective action.  It's a pretty standard process in the cybersecurity domain.



Q.   Did you read this document?

A.   Yes.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 75



Q.    Right.  But my question was:  When you read those specific terms, did it concern you at all?

A.    They're inputs --

        (The reporter requests clarification.)

        THE WITNESS:  It's an input.  Every evaluation is an input into a corrective action risk-management-based paradigm.

BY MR. CAHALAN:

Q.    So it didn't concern you at all?

A.    It's an input into a risk management perspective.  All risk concerns me.

Q.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 76

A.    As expressed.

Q.    What is JavaScript?

A.    I'm trying to think how to explain it.  It's --

Q.    No, no, take your time.

A.    It's a little technical.

Q.    Understood.

A.    They're commands.  JavaScript would be -- it's a scripting language where -- and many websites and services are built in JavaScript.  So the things you're using on your laptop today are built in JavaScript. It's a very common technical language used to create and develop solutions.

Q. ████████████████████████████████

████████████████████████████████████

██  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

██  ████████████████████████████

████████████████████████████████

████████████████████████

Q.  ████████████████    ████████████

████████  ████████████████    ████████

████████████████████████████

████████████████████████████

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 77



BUELL REALTIME REPORTING, LLC
206.287.9066 ! 800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 78



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.        Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 79



BY MR. CAHALAN:

Q.   Can you answer the question as I stated it?

A.   Would you repeat the question.

MR. CAHALAN:  Can you read it back.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 80

(Question was read back.)



BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 81



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 83



BY MR. CAHALAN:

Q.    Okay.

A.    Not sure if that's helpful.

Q.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



iRobot Corporation v. Expeditors International of Washington, Inc.       Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 85



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 86



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 87



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 88

1c1952d7-f04a-4fcf-b6cd-c4c99bd601c

Page 89



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.        Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)



Page 90

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Case 2:23-cv-00580-SJB-AYS     Document 45-6     Filed 07/31/25     Page 22 of 80 PageID #: 820

Page 91



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 92



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.        Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)



BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 94



BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 95



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)



Page 97

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 98



BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 99



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 100



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 101



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 102



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.          Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 103

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮     ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MR. CAHALAN:  Off the record.

(Pause in the proceedings.)

MR. PIKUS:  Exhibit 9 is designated as "Highly Confidential - For Limited Eyes Only", so I would ask that the protocol in the protective order be applied to the sections of the deposition beginning with the identification of Exhibit 9 and up to the present.

MR. CAHALAN:  And, David, I may have other documents that are limited or attorneys' eyes only, so you can say that every time or we can stipulate that that will be the condition --

MR. PIKUS:  Sure.

MR. CAHALAN:  -- for the documents.

MR. PIKUS:  I'm just trying to help the reporter so she's got a section that she knows is applicable.

MR. CAHALAN:  Sure.

(A break was taken from 12:59 p.m. to 1:50 p.m.)

(Exhibit No. 10 marked.)

THE WITNESS:  Thank you.

BY MR. CAHALAN:

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    ·    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 104

Q.    Mr. McClincy, you're being passed what's been marked as Exhibit 10.

MR. CAHALAN:  Right?

BY MR. CAHALAN:

Q.    Do you know what this document is?

A.    I'm familiarizing myself with it.  Looks a bit old.

Q.    Okay.

A.    But clearly --

Q.    Feel free to read through it.

A.    Okay.

(Reviews exhibit.)

Okay.

Q.    Okay.

A.    Familiarized myself with this.

Q.    All right.

Do you recognize this document now?

A.    Not the document specifically, but it's addressed to me.  Again, I read a lot of documents.

Q.    Sure.

A.    So...

Q.    Okay.  Well, this is a document that is titled "Branch Backups and Restore Readiness in Response to a Potential Ransomware Cyberattack"; correct?

A.    Uh-huh.  Yes.

Page 105

Q.    And it's dated May 25th, 2021?

A.    Agree.

Q.    Okay.

Underneath the heading of "Purpose" on the first page, it references the Colonial Pipeline attack on May 7th, 2020 -- 21 -- 2021.

What was that?

A.    The Colonial Pipeline, what was it?

Q.    Yes.

A.    It was a cybersecurity attack on the Colonial Pipeline.

Q.    And what happened to Colonial's systems during that attack?

A.    I believe they were taken offline.

Q.    Okay.

Did that attack raise the awareness of Expeditors of the ability of hackers to infiltrate systems?

A.    That attack increased the awareness of cyberattack for all organizations.

Q.    Including Expeditors?

A.    Including Expeditors.

Q.    Sure.

Under the heading "What is the Concern," it states in the second sentence:   The pipeline company

Page 106

halted all of the pipeline's operations to contain the attack.

    You see that?

    A.    I do.

    Q.    And that's an accurate statement as far as you know?

    A.    As far as I know.  As far as I recall.  Again, that incident took place a few years ago.

    Q.    Two sentences after that it says, quote:  These types of attacks continue to happen in increasing frequency and impact.

    Do you see that?

    A.    Yes, sir.

    Q.    Would you agree with that statement as of May 2021?

    A.    Yes, sir.

    Q.    Under "Expeditors' Risk" at the bottom of the first page, it says, quote:  While Expeditors' cybersecurity team has provided great training and protection against ransomware, we must be prepared to address a worst-case scenario in which we are required to respond to a ransomware attack that is successfully executed and has widely encrypted systems.  Loss of operations at one or more top branches will have a significant impact on revenue, freight and company

Page 107

reputation.

Do you see that?

A.    Yes, sir.

Q.    Do you agree with that statement?

A.    (Reviews exhibit.)

Yes.

Q.    Further down on the second page, under the heading "Timeline and Process," it says under the first, quote:  It should be noted that it is a relatively simple process and an SOP for us to pull backup status of systems under management in our CMDB.

Do you see that?

A.    Yes, sir.

Q.    What is the relatively simple process that's referred to here?

A.    I believe that means their reports are automated, efficient, and productive.  But I didn't do those processes myself, so I couldn't speak with specificity.  But I infer or interpret "a relatively simple process" to mean that... it's not a lot of effort.

Q.    Can you just turn back to the first page.  I had one quick question.  This document is from Mike Pederson and Nate Lynch and addressed to you and Henry Salloum; is that right?

Page 108

A.    Correct.

Q.    Who are Mike Pederson and Nate Lynch?

A.    Mike Pederson, I believe at this time, was responsible for data center team.  And it's a little dated and we've since reorganized, so I'm going from memory.  But I believe Mike Pederson reported into Brendan Brecht -- or Matt Brown.  Sorry.  Different people.  Responsible for data centers at the end of the day.  Nate Lynch was responsible for IS risk management.

Q.    Right.  We mentioned Mr. Lynch before.

A.    Yeah.

Q.    Could you turn to page 5 of this document.

A.    Yes.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 110

missed for some period of time, either for reasons of -- for rational reasons or because -- maybe rational's not the right word.

Can you rephrase the question.  Sorry, I got lost in my own thought.

Q.    Sure.

A.    Sorry.

Q.    So let's say generally, if every branch for Expeditors was backing up their systems on a daily basis, if the system was then shut down, would Expeditors be able to pick up from the time that the system was shut down and resume operations?

A.    With some variance of ours generally.

Q.    And the variance being whether or not they had the ability to back up certain information?

A.    Well, the way I interpreted your question is: If we shut a system down, and then we turn it back on again, will it back up?

And the answer to that question is:  Yes.

I'm not sure if that's the question you're asking.  I apologize.

If we shut a system down, or it goes down, and then we bring it back up again, will it -- will it back itself up?  The answer to that is:  Yes.

Q.    Okay.  Based upon the backup, would you be able

Page 111

to operate if you shut your system down and then set up a backup system based upon what had already been saved?

A. Yes.

Q. Can you turn to page 8 of this document. And it's, at the bottom, EIW 0108499.

A. Yes, sir.

Q. There is a bolded heading that says: Our concerns for backup health and resulting actions from this research are as follows.

Do you see that?

A. Yes, sir.

Q. And then the... the fifth paragraph down says, quote: We have some concern from the findings that our replication processes may not include enough time lag for safety that viruses are not replicated to backup site. Our design on this is several years old and should be reassessed jointly by data centers and cybersecurity.

Did I read that correctly?

A. Yes.

Q. What does that mean?

A. I interpret this as there being a concern that our backup procedures could replicate viruses... is how I'm interpreting this paragraph.

Q. Okay. And it says: At -- our design is several

Page 112

years old.

Is that accurate?

A.   The design is several years old.  It -- you know, again, not having seen this in a while, let me read this section again.

(Reviews exhibit.)

Okay.  I understand.  Yeah, this is -- they're interpreting -- we are interpreting this as our -- our design on this is old.  I agree with what's written.

Q.   The design on backing up the systems?

A.   Aspects of backing up the system.

Q.   Well, it doesn't refer to aspects, does it?

A.   You have to, again, take the overall context, backup architecture and how we look at backups holistically, and this is just a piece of that.  This document is just a part of that.

Q.   It says:  Replication processes.

What does that refer to?

A.   Oh, in the -- (as read):  We have some concerns about the findings that our replication process may not include enough lag time for safety.

I would need to drill into that.  Replication -- "replication processes" are technically a generic term. That means data's replicating somewhere.  And so in our organization, we would have a lot of different

IRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 113

replication processes.  Email's a replication process. So I would need to drill into that with the authors of the document to infer what they were talking about.

I'm not sure if they're talking about backing up the disc, backing up the tape, backing up between disaster recovery sites.  There's -- again, context would be important in understanding what they're referring to.

Q.   Okay.  But then it refers to time lag for safety, then viruses are not replicated to the backup site.

What does that mean?

A.   (Reviews exhibit.)

I'm inferring or interpreting this as meaning there may have been cause for concern that replication processes may need to have lag time built into them to reduce the risk of having viruses replicate.  That's how I'm interpreting this.

Q.   Meaning that even if you back something up, if it had backed up a virus, it wouldn't be able to then be put back into, I guess, working order?

A.   Well, this is the challenge of an interpretation.  It could mean a few different things.

One -- one way to potentially infer this without talking to the team would be they wanted lag in the

Page 114



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 115



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 116



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 117



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 118



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.        Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 119



Q.    In December 2021, who was on the cybersecurity committee?

A.    I would need to go back and look through for specific names.

Q.    Do you know any names?

A.    I would be assuming or guessing.  It would have been somebody at a senior or executive level across each of the functional areas of the company, in product,

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 120

services, accounting, IS, geography.

That group -- this group has existed for many, many years.  Whom exactly were members on this specific date, I would need to go back and look.

Q.    How big was the cybersecurity committee?  How many people?

A.    I'm guessing between eight and 12 people.

Q.    If you could turn to the page that ends in 946 as a Bates number.

Are you there?

A.    Yes, sir.

Q.    Okay.

This page is titled "2021 Highlights."  Correct?

A.    Yes, sir.

Q.    The second bullet point on that page says, quote:  This year brought the largest increase of cyber threats in human history.

Do you see that?

A.    Yes.

Q.    Okay.  Was that an accurate statement in 2021?

A.    That's an accurate statement every year.

Q.    The next bolded heading says:  The year we moved from a prevent-breach-only mode to both prevent and assume breach.

What does that mean?

Page 121

A.    (Reviews exhibit.)

I can't speak with specificity to this statement.  "The year we moved from a prevent-breach-only mode to prevent and assume breach."  The way I interpret this is we continue to advance and evolve our mitigation and preparation for increased cybersecurity threats.  It was common, you know, throughout the history of our cybersecurity program to continue to adapt and evolve to the risk landscape that all companies, you know, live, exist and operate within.

So, again, I don't recall this specific language, so I can't speak to it with specificity, but it was normal for the program to adapt, evolve, and pivot based upon what's happening in the general overall landscape of cybersecurity as a threat.

Q.    When it says "assume breach," does this mean that Expeditors was aware that a breach was not only possible, but probable in 2021?

A.    Well, I think Expeditors and most organization [sic] have always acknowledged that a breach is probable.

Q.    Can you just turn to the last page, which ends in 958.

A.    956?

Q.    956.  God, my eyes are not doing well today.

Page 122

A.   I understand.  I have glasses too.

Q.   This page is entitled "Active Cybersecurity Ethics"; is that right?

A.   Yes, sir.

Q.   All right.  Under "Response," there are a number of bullet points; correct?

A.   Yes.

Q.   All right.

What are these -- what are these bullet points describing?

A.   I will interpret it or infer -- again, this goes back a couple of years -- technical breach response drill -- excuse me.

Q.   Bless you.

A.   Thank you.

-- I believe was how the technical team, our cybersecurity incident response team, technically responded to a breach.  Again, I'm inferring.  I have some knowledge of these things.

"Incident response provider selection" most likely was related to us seeking additional expertise outside the organization to help us respond to an incident.

"Cybersecurity readiness assessment" is too abstract.  It's a difficult one for me to interpret



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 124



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 125

A.    It's part of our cybersecurity program.

Q.    Who was it done by?

A.    The IS risk management team.

Q.    And who was on the IS risk management team?

A.    I wouldn't remember to be able to name employees, but it reported up through Henry Salloum, Nate Lynch.  Caitlin McGinley may have been a part of that.  John O'Neill, and there would be others.  That -- that -- it was a team of people.  I don't remember all the names of the people that worked on that team at that point in time.

Q.    And who was it sent to?

A.    I wouldn't remember the audience.  I'd have to look.

(Exhibit No. 12 marked.)

THE WITNESS:  Thank you.

BY MR. CAHALAN:

Q.    You have been passed what's been marked as Exhibit 12.  It's a document entitled "The Cyber Weekly Reporter."

Is that correct?

A.    Yes, sir.

Q.    You recognize this document?

A.    I recognize the document, not this one specifically.  I've seen a lot of these documents.

Page 130

A.    Affirmative.

Q.    Okay.

The first page of this document details seven third-party incidents.

Am I right on that?

A.    I'm counting.

(Reviews exhibit.)

But just for specificity, this table illustrates seven different events, but I'm not sure if these up here correlate to those.  So we have a January, December, November timeline of events, and there's a table of different events below it.

Q.    Okay.  Well, underneath the start of the table, it says, quote:  Currently, we have seven open third-party incidents.

Right?

A.    Confirmed.

Q.    Okay.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 131



Q.    Can you turn to the third page, please.

A.    Yes.

Q.    This is under the heading of: Expeditors cybersecurity efforts; correct?

A.    Yes.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 132



Q.   You know you're here testifying on behalf of Expeditors specifically as it relates to the steps that they took prior and subsequent to February 20th, 2022; right?

A.   Yes.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 133

Q.   Can you turn to the page that ends in 443.   At the top it says:   External Expeditors cybersecurity reports.

Do you see that?

A.   Yes.



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 134



Q.   You don't get to ask me questions.

A.   I'm sorry.

Q.   Okay.

MR. PIKUS:  You can explain that as part of your answer, but you can't ask him questions.

THE WITNESS:  I understand.  Apologies.

MR. PIKUS:  So if as a rhetorical point, you can finish your answer.  But that's up to you.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.        Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 135



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 136

A.    I don't know.

(Exhibit No. 14 marked.)

THE WITNESS:  Thank you.

BY MR. CAHALAN:

Q.    You've been handed what's been marked as Exhibit 14.

A.    Yes, sir.

Q.    Do you recognize this document?

A.    Not this one specifically.  However, I received a number of these documents.

Q.    Okay.  This is similar to the document that we looked at as Exhibit 11; is that right?

A.    Affirmative.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 138



(Exhibit No. 15 marked.)

(Pause in the proceedings.)

BY MR. CAHALAN:

Q.   All right.  You've been given what has been marked as Exhibit 15; is that correct?

A.   Confirmed.

Q.   And this is entitled:  FBI Flash.

Do you see that?

A.   Confirmed.

Q.   And it's dated as of February 4th, 2022?

A.   Confirmed.

Q.   I will represent to you that, while this does not have any Bates numbers at the bottom right, this was taken from Expeditors' production in this litigation.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 140

quote: ████████████████████████████████
████████████████████████ and employs a wide variety of tactics, techniques and procedures, TTPs, creating significant challenges for defense and mitigation.

Is that right?

A.   Confirmed.

Q.   Okay.  Were you aware as of -- strike that.

Was Expeditors aware as of February 2022 that LockBit 2.0 was a significant concern to Expeditors' systems?

A.   Expeditors was aware that ransomware was a meaningful threat to all organizations, including Expeditors.

Q.   What about LockBit 2.0 in particular?

A.   I don't know.

Q.   Had Expeditors ever heard of LockBit 2.0 before February 2022?

A.   I don't know.

Q.   The second paragraph under "Summary" states, quote:  After compromising a victim network, LockBit 2.0 actors use publicly available tools such as --

(The reporter requests clarification.)

BY MR. CAHALAN:

Q.   ████████████████████.  That's the best --

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 141

am I pronouncing that correct?

A.    You are, yeah.

Q.    (As read):  -- to escalate privileges.  The threat actors then use both publicly available and custom text to exfiltrate data followed by encryption using the LockBit malware.

Do you see that?

A.    Yes, sir.

Q.    Was Expeditors aware of how LockBit 2.0 could compromise a network as of February 2022?

A.    Expeditors was aware of ransomware as a threat as of February 2022.  Specific to LockBit, I don't know.

Q.    Can you turn to page 2.  Under the heading "Technical Details," it describes what LockBit 2.0 can do to a system.

Would you agree with that?

A.    (Reviews exhibit.)

It provides technical details on how LockBit functions.

Q.    Okay.  And it states, quote:  LockBit 2.0 is best described as a heavily obfuscated ransomware application leveraging bitwise operations to decode strings and load required modules to evade detection.  Upon launch, LockBit 2.0 decodes the necessary strings in code to import the required modules followed by

Page 142

determining if the process has administrative privileges.  If privileges are not sufficient, it attempts to escalate to the required privileges.

Do you see that?

A.   Yes, sir.

Q.   Okay.  And then further down in that paragraph it states:  As infections begin, LockBit 2.0 deletes log files and shadow copies residing on disc.  LockBit 2.0 enumerates system information to include host name, host configuration, domain information, local drive configuration, remote shares, and mounted external storage devices.  LockBit 2.0 attempts to encrypt any data saved to any local or remote device, but skips files associated with core functions.  Once completed, LockBit 2.0 deletes itself from disc and creates persistence at startup.

Did I read that correctly?

A.   Yes, sir.

Q.   Was Expeditors aware of what LockBit 2.0 could do at this time?

MR. PIKUS:  At which time?  You mean today or --

MR. CAHALAN:  No, as of February 2022.

THE WITNESS:  As of February 2022, yes.

BY MR. CAHALAN:

Page 144

THE WITNESS:  I agree that it is possible that, if the FBI made this document available to the general public on February 4th, then it is possible that an employee of Expeditors could have downloaded the document.

BY MR. CAHALAN:

Q.  But you're not aware of anybody from Expeditors who actually did download that document?

A.  No, sir.

Q.  And nobody provided you that document?

A.  Not to my memory.

Q.  If you turn to the second-to-last page of this document -- no, I'm sorry.  The third-to-last page, you see a heading that says:  Recommended mitigations?

A.  Yes, sir.

Q.  And it has six bullet points for recommended mitigations; correct?

A.  Yes.

Q.  Did Expeditors have all of these mitigations in place as of February 2022?

A.  No.

Q.  Which ones did it not have in place as of February 2022?

A.  I wouldn't be able to answer with specificity. We -- I'd need to go back and conduct research.  Some of

Page 145

them are obvious to me. Require multifactor authentication for all services. We had multifactor authentication, but not for all services.

So there -- there's nuance with some of them. So I could speak to them generally, but not with specificity, and I would need to consult with others to answer them with any accuracy.

Q. Okay. But as you sit here today, you know that Expeditors did not have all six of these mitigation -- mitigations in place as of February 4th, 2022; correct?

A. Correct.

Q. All right. And one of them, you mentioned the requirement for multifactor authentication for all services, that wasn't in place; is that right?

A. Correct.

Q. Okay. The fifth bullet point: Use a host-based firewall to only allow connections to administrative shares via server message block from a limited set of administrator machines.

Was that in place at Expeditors as of February 4th, 2022?

A. I don't know.

Q. What about the fourth bullet point: Remove unnecessary access to administrative shares, especially "Admin" with a dollar sign and "C" with a dollar sign?

Page 146

█████████████████████████████████

███████████████████████

██   ███████████████

Q.    Right below those six bullet points, there's a new paragraph that states, quote:  Adversaries use system and network discovery techniques for network and system visibility and mapping.  To limit an adversary from learning the organization's enterprise environment, limit common system and network discovery techniques by taking the following actions.

Did I read that correctly?

A.    Confirmed.

Q.    All right.  The first bullet point says: Segment networks to prevent the spread of ransomware.

Do you see that?

A.    Yes.

Q.█  ███████████████████████████

████████████████████████████████

███████████████████

███   ████

███   █████   ████████████████

████████████████

███   ███████████████████

████████████████████████████

██████████████████████████████

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.          Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 147



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 148

MR. PIKUS:  Again, we're talking about what time period?

MR. CAHALAN:  February 2022.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 149



(Exhibit No. 16 marked.)

THE WITNESS:  Thank you.

BY MR. CAHALAN:

Q.    You have what has been marked as Exhibit 16; is that right?

A.    Yes, sir.

Q.    Do you recognize this document?

A.    Again, not this one specifically, but familiar with the format.

Q.    This is another cybersecurity committee report; correct?

A.    Confirmed.

Q.    As of February 8th, 2022?

A.    Confirmed.

Q.    Can you turn to the page that ends in 208.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

A.    Confirmed.



Q.    What does NIST refer to?

A.    National Institute of Standards and Technology. They provide best practices for managing cybersecurity.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 151



1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 152



        MR. PIKUS:  I'm gonna object to the form of
the question.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce

Page 153



MR. CAHALAN:  I'd move to strike that response.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601c

iRobot Corporation v. Expeditors International of Washington, Inc.    Chris McClincy (AWAITING CONFIDENTIAL DESIGNATIONS)

Page 154



Q.    You don't want to just answer a straightforward question, do you?

MR. PIKUS:  I'm gonna object to that.  Let's not argue with the witness.  Let's ask him questions, please.

MR. CAHALAN:  Can we take a five-minute break?

MR. PIKUS:  Sure.

(A break was taken from 3:09 p.m. to 3:18 p.m.)

BY MR. CAHALAN:

Q.    All right.  I want to ask you some questions about the cyberattack itself that took place in February 2022.

MR. PIKUS:  May I just ask if you're finished with the confidential documents?  For the moment.

MR. CAHALAN:  I'm finished with the

1c1952d7-f04a-4fcf-b6cd-c4c99bd601c

Page 157

identification.

Q.   The coordination that you described between the cybersecurity incident response team and Microsoft, when did that occur?

A.   Late 2000 -- I'm sorry, late the 19th or early the 20th.  Approximately in that window.  I don't know the exact hour.

1c1952d7-f04a-4fcf-b6cd-c4c99bd601ce