UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
IROBOT CORPORATION,

          Plaintiff,

      v.

EXPEDITORS INTERNATIONAL OF
WASHINGTON, INC.,

          Defendant.
--------------------------------------------------------X

**MEMORANDUM
AND ORDER**
23-CV-0580-SJB-AYS

**BULSARA, United States District Judge:**

Plaintiff iRobot Corporation ("iRobot") filed this breach of contract action against

its distributor Expeditors International of Washington, Inc. ("Expeditors"). iRobot

makes home robots, including the Roomba vacuum, and hired Expeditors to assist with

inventory management, shipping, and other distribution services. It claims that

following a 2022 cyberattack, Expeditors ceased providing any services for at least three

weeks and iRobot had to make various costly, alternative arrangements for which it

seeks compensation. Expeditors argues that because the cyberattack was caused by

events beyond its control, the agreement's "force majeure" clause relieves it from

liability.

The parties have filed cross-motions for summary judgment as to iRobot's sole

cause of action for breach of contract and Expeditors's twelve affirmative defenses.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. dated Apr. 9, 2025 ("Pl.'s Mot."), Dkt. No. 46-

35; Def.'s Mem. in Opp'n to Pl.'s Mot. & in Supp. of Cross-Mot. for Summ. J. dated May

13, 2025 ("Def.'s Opp'n & Cross-Mot."), Dkt. No. 47-15). Expeditors has also moved to

seal exhibits relevant to the parties' papers.  (Def.'s Mem. in Supp. of Mot. to Seal dated July 23, 2025 ("Def.'s Mot. to Seal"), Dkt. No. 45-12).  For the reasons explained, iRobot's motion is granted in part and denied in part and Expeditors's motion for summary judgment and motion to seal are both denied.

STANDARD FOR SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  "This is true even though the court [is] presented with cross-motions for summary judgment; each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor."  *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988).  "When both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all

2

reasonable inferences against the party whose motion is under consideration." *Alta Partners, LLC v. Getty Images Holdings, Inc.*, 165 F.4th 141, 149 (2d Cir. 2026) (quotation omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence).

The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions*[.]"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c).

The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-

CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)).

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

The Court finds the following facts relevant to its decision—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted. Where a relevant genuine dispute exists, the Court highlights both parties' versions of the facts. The Court does not consider portions of the parties' Rule 56.1 statements that are legal conclusions, irrelevant, or merely objections to inferences drawn from the opposing party's statements. Here, much of the evidence the parties rely on in their briefs and for their arguments is nowhere to be found in the Rule 56.1 statements—specifically the

5

findings of Expeditors's experts.[1]  The briefing contains significant language from reports absent from the Rule 56.1 statements, citations to evidence without pincites, and assertions without citations to the Rule 56.1 statements at all.[2]  As such, the Court does not include those statements below or in deciding the motions themselves.

iRobot is a global consumer robot company that designs and builds robots and intelligent home innovations, including the Roomba robot vacuum.  (Pl.'s Rule 56.1 Statement dated Apr. 9, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No. 46-36 ¶ 1; Def.'s Rule 56.1 Statement dated May 13, 2025 ("Def.'s 56.1 Stmt."), Dkt. No. 47-16 ¶ 1).  Expeditors is a publicly traded, global logistics company; its services include air and ocean freight, customs brokerage, order management, warehousing, and distribution.  (*Id.* ¶ 2; Pl.'s 56.1 Stmt. ¶ 4).  iRobot used Expeditors as one of its logistics providers for more than a decade.  (*Id.* ¶ 3; Def.'s Resp. to Pl.'s 56.1 Stmt. dated May 13, 2025 ("Def.'s Resp. 56.1 Stmt."), Dkt. No. 47-17 ¶ 3).  iRobot relied on Expeditors to ship its products to the United States, unload and transport the products to Expeditors's warehouses, provide inventory of stored products, and then ship products to identified retail customers.  (Pl.'s 56.1 Stmt. ¶¶ 6–8).

Effective October 2018, the parties executed a written agreement for Distribution Services (the "Agreement"), governing the parties' relationship.  (*Id.* ¶ 9; Def.'s 56.1

---

[1] Expeditors includes only a single citation to the expert reports and depositions in its Rule 56.1 Statement, (Def.'s Rule 56.1 Statement ("Def.'s 56.1 Stmt."), Dkt. No. 47-16 ¶ 7), yet argues and quotes from them extensively in its briefs.

[2] Expeditors also makes several assertions of "undisputed and unrebutted facts" in its papers, (Def.'s Reply in Supp. of Mot. for Summ. J. dated July 16, 2025, Dkt. No. 49-1 at 1), many of which are not found in its Rule 56.1 Statement.

Stmt. ¶ 3).  In pertinent part, Expeditors agreed to "have [iRobot's] goods available to ship within twenty-four (24) hours of receipt of [iRobot's] order."  (Agreement, attached to Pl.'s Mot. as Ex. A, Dkt. No. 46-4 ¶ 17).  Under Paragraph 7 of the Agreement, Expeditors was to "provide [iRobot] access to their exp.o customer portal where [iRobot] can view real-time data and retrieve standard reports."  (*Id.* ¶ 7).  Expeditors was required to input into e.dms information about "receiving, storage, inventory transactions, and completed shipment information" within four hours of completing a transaction.  (*Id.* ¶ 8).  Expeditors was also required to "maintain a business continuity plan designed to mitigate interruption upon the occurrence of a disaster or any other operational occurrence that could reasonably be expected to materially disrupt" the services it provided.  (*Id.* ¶ 36).  And upon such an occurrence, Expeditors was required to "implement such plan."  (*Id.*).

On February 20, 2022, Expeditors was the subject of a cyberattack.  (Def.'s 56.1 Stmt. ¶ 5; Pl.'s 56.1 Stmt. ¶ 18).  The initial incursion occurred as a result of a "phishing" attack when an Expeditors employee downloaded a fake browser update on his laptop outside of Expeditors's VPN.  (*Id.* ¶ 19; Def.'s Resp. 56.1 Stmt. ¶ 19).  Upon learning of the cyberattack, Expeditors shut down its global operating systems and disclosed the shutdown that same day in a press release.  (*Id.* ¶¶ 22–23; Pl.'s 56.1 Stmt. ¶¶ 22–23; Press Release, attached to Pl.'s Mot. as Ex. F, Dkt. No. 46-9).  The cyberattack was a ransomware attack, meaning that a hostile actor held its systems hostage and demanded payment for service restoration.  Expeditors hired a third-party, Coveware, to communicate with the ransomware actors.  (Pl.'s 56.1 Stmt. ¶ 51; Def.'s Resp. 56.1

7

Stmt. ¶ 51).  The actors demanded a ransom, but Expeditors decided not to pay, instead attempting to restore its systems on its own.  (*Id.* ¶¶ 50, 52; Pl.'s 56.1 Stmt. ¶¶ 50, 52).

Expeditors publicly disclosed that it had "shut down most of [its] operating system globally" and that there would be "limited ability to conduct operations."  (*Id.* ¶ 24; Def.'s Resp. 56.1 Stmt. ¶ 24; *see also* SEC Form 10-Q, attached to Pl.'s Mot. as Ex. R, Dkt. No. 46-22 at 10 ("Upon discovering the [February 20, 2022] incident, [Expeditors] shut down most of its connectivity, operating and accounting systems globally[.] . . . [Expeditors] had limited ability to conduct operations for a period of approximately three weeks[.]")).  iRobot alleges that following the shutdown, Expeditors ceased providing services, including new order processing and access to Expeditors's electronic data interchange ("EDI"), used to track inventory and process orders.  (Pl.'s 56.1 Stmt. ¶¶ 27–31).

Expeditors maintained a 57-page Business Continuity Plan, ("BCP"), (Def.'s 56.1 Stmt. ¶ 8; *see also* BCP, attached to Decl. of Chris McClincy as Ex. B, Dkt. No. 47-2), but the parties dispute the extent to which the BCP was used or effective in mitigating the effects of the disruption, (Pl.'s Resp. to Def.'s 56.1 Stmt. dated June 23, 2025 ("Pl.'s Resp. 56.1 Stmt."), Dkt. No. 48-5 ¶ 8).  The parties also dispute the effectiveness of the manual solutions that were implemented or offered to iRobot.  (*E.g.*, *compare* Pl.'s 56.1 Stmt. ¶ 31 (asserting that EDI was not reactivated until mid-April 2022), *with* Def.'s Resp. 56.1 Stmt. ¶ 31 (citing Decl. of Chris McClincy ("McClincy Decl."), attached to Def.'s Opp'n & Cross-Mot., Dkt. No. 47-2 ¶ 9 (admitting that while Expeditors shut down EDI, they

were able to provide manual alternatives and backup solutions to provide reasonably timely information))).

Expeditors also engaged Mandiant, a cybersecurity company, to investigate the attack, including determining the scope of the intrusion and the cause of the attack. (Pl.'s 56.1 Stmt. ¶ 26; Def.'s Resp. 56.1 Stmt. ¶ 26; *see also* Mandiant Report, attached to Def.'s. Opp'n & Cross-Mot. as Ex. K, Dkt. No. 44-3 at 111866). Mandiant attributed the attack to two groups known by titles UNC1543 and UNC2165. (Pl.'s 56.1 Stmt. ¶ 20; Def.'s Resp. 56.1 Stmt. ¶ 20). A UNC, or "uncategorized," designation indicates that the cyberactivity has not been definitively attributed to a known threat actor or tied to any nation-state. (Pl.'s 56.1 Stmt. ¶ 21).[3] Mandiant identified the groups as "financially motivated." (Pl.'s 56.1 Stmt. ¶ 56).

Expeditors contends that the cyberattack was a new variant of malware for which there was no commercially available defensive product at the time. (Def.'s 56.1 Stmt. ¶ 6). After the attack, Microsoft, the purveyor of the Defender software utilized by Expeditors, had to develop a patch for the software. (*Id.* ¶ 7; Pl.'s Resp. 56.1 Stmt. ¶ 7).

---

[3] In attempting to dispute this fact, Expeditors cites to the entirety of a declaration from its expert Christopher Stangl and his accompanying report assessing the cybersecurity threat landscape as of January 2022—without any pinpoint citation to a page or paragraph. (Def.'s Resp. 56.1 Stmt. ¶ 21). This is an improper means by which to refute a fact in a Rule 56.1 Statement. And it is wrong: the Stangl report confirmed that the attackers had been designated as uncategorized and had not been attributed to a known group. (Disclosure of Christopher Stangl, attached to Decl. of Chrisopher Stangl as Ex. A, Dkt. No. 47-5 ¶ 8 n.3).

iRobot commenced this action in the Nassau County Supreme Court on January 6, 2023.  (Notice of Removal dated Jan. 26, 2023, Dkt. No. 1 ¶ 1).  iRobot asserted a single cause of action against Expeditors for alleged breach of the Agreement.  (Compl. dated Jan. 6, 2023, attached to Notice of Removal as Ex. A, Dkt. No. 1-1 ¶¶ 39–46).  On January 26, 2023, Expeditors removed the action to this Court, (Notice of Removal at 3), and filed its Answer on February 2, 2023, asserting twelve affirmative defenses, (Answer, Dkt. No. 6 at 6–7).  The parties completed briefing on their cross-motions for summary judgment on August 5, 2025.[4]

DISCUSSION

## I.      Alleged Defective Proof of Claim

As a threshold matter, Expeditors argues that it is entitled to summary judgment on iRobot's breach claim, because iRobot's proof of claim was not properly sworn in violation of Paragraph 30 of the Agreement.  (Def.'s Opp'n & Cross-Mot. at 10–14).  Paragraph 30 of the Agreement provides Expeditors will not be liable "unless a preliminary notice of claim" is presented to Expeditors by iRobot.  (Agreement ¶ 30).  The claim is to be "written, with a sworn proof of claim attached."  (*Id.*).

On August 11, 2022, iRobot's Chief Legal Officer Glen Weinstein sent a proof of claim to Expeditors.  (iRobot Aug. 11, 2022 Claim for Damages, attached to Def.'s Opp'n & Cross-Mot. as Ex. E, Dkt. No. 47-6 at 127–28 ("In furtherance of its collection efforts, iRobot hereby submits its sworn proof of claim relating to damages sustained during

---

[4] The case was transferred from the Honorable Joan M. Azrack to the undersigned on January 31, 2025.

the Outage pursuant to Section 30 of the Agreement.")).  Expeditors contends that the electronic signature at the end of the letter is not "sworn."  (Def.'s Opp'n & Cross-Mot. at 10–11).  Expeditors argues that the signature must contain the stamp of a notary or "some other indication that the maker was actually sworn" to a third-party.  (*Id.* at 11).  But New York law imposes no such requirement.  *See* N.Y. C.P.L.R. § 2309(b) (McKinney 2024).  Expeditors cannot identify any notary requirement in either federal or state rules of procedure.  The Agreement also lacks any specific method for swearing the proof of claim.  (*See* Agreement ¶ 30).  In his letter, Weinstein confirmed that the submission and damages calculations were "[s]worn as of the date of this letter." (iRobot Aug. 11, 2022 Claim for Damages at 128).  That is sufficient.  Expeditors has failed to show that the Agreement or New York law required more.[5]

In any event, Expeditors waived any objection to the method of swearing on August 31, 2022, when it denied iRobot's claim on the merits and told iRobot that its claim was properly submitted.  (*See* Expeditors's Aug. 31, 2022 Claim Denial, attached to Pl.'s Mot. as Ex. DD, Dkt. No. 46-34 ("[Expeditors] appreciate[s] the fact that iRobot has followed the claims process established through the parties' contracts and course of dealing *by providing appropriate documentation so that the Claim could be assessed*, and a decision could be made on the merits.") (emphasis added)));  *cf. N.Y. Hosp. Med. Ctr. of Queens v. QBE Ins. Corp.*, 114 A.D.3d 648, 649 (2d Dep't 2014) ("By failing to timely

---

[5] The hodge-podge of cases cited by Expeditors to support their notary requirement (including some where the underlying agreement required specific methods of swearing) are inapposite.  *See, e.g., Melamudov v. Colonia Ins. Co.*, 202 A.D.2d 557, 558 (2d Dep't 1994) (unsigned proof of claim).

contest, at the claims stage, the adequacy of the claim forms employed by Westchester Medical Center to establish proof of the claim it submitted on behalf of de los Santos, the defendant waived its right to rely on any deficiencies in those forms at the litigation stage.").

## II.    Breach of Contract, Force Majeure, and Impossibility

Turning to the merits, under New York law,[6] the elements of a breach of contract claim are "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 276 (2d Cir. 2018). Expeditors only moves for summary judgment on the question of whether there was a breach.[7]

iRobot asserts that Expeditors breached the Agreement by failing to make its goods available to ship within 24 hours of an order, as of the February 20, 2022 shutdown of its operations. (Pl.'s Mot. at 14–15). And second, it alleges there was a breach of Paragraphs 7 and 8 which required Expeditors to provide iRobot access to

---

[6] By its terms, the Agreement is governed by New York law. (Agreement ¶ 44 ("The foregoing terms and conditions shall be construed according to the laws of the State of New York, without application of conflicts of law principles.")). No objections were raised to the contrary, as both parties apply New York law in support of their respective interpretations of the Agreement. "[S]uch implied consent is . . . sufficient to establish the applicable choice of law." *Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31 (2d Cir. 2017) (quotation omitted).

[7] Expeditors seemingly argues that any damages were the result of iRobot's decision to transition to GXO, as opposed to its alleged breach. (Def.'s Opp'n & Cross-Mot. at 16–19). Given the denial of summary judgment on the breach of contract claim on other grounds, the Court does not address this argument.

"real-time data" and the ability to "retrieve standard reports" within four hours of completing a transaction through its EDI systems. (*Id.* at 16–17; Agreement ¶¶ 7–8).[8]

With respect to these two breaches, Expeditors does not deny that its services were affected by the cyberattack. (*See* Def.'s Reply in Supp. of Mot. for Summ. J. dated July 16, 2025 ("Def.'s Reply"), Dkt. No. 49-1 at 1). Instead, Expeditors raises several affirmative defenses in response to these alleged breaches.[9] Because the Court cannot decide the applicability of some of these defenses as a matter of law, it cannot grant summary judgment to either party.

---

[8] iRobot also alleges that Expeditors breached the Agreement by failing to maintain a business continuity plan. (Pl.'s Mot. at 18). The parties do not dispute that a business continuity plan existed, rather they dispute whether the plan satisfied the Agreement's requirement. (*See id.*). For instance, iRobot argues that any implementation of a manual process took weeks and was insufficient under the Agreement. (Pl.'s Opp'n to Def.'s Mot. & Reply in Supp. of Summ. J. dated June 23, 2025 ("Pl.'s Opp'n & Reply"), Dkt. No. 48-4 at 12–13). Expeditors contends that the Agreement required it to prepare and implement a plan, not to guarantee its success even under extraordinary circumstances, (Def.'s Opp'n & Cross-Mot. at 16), among other arguments. Like the other alleged breaches, there are facts in dispute. But again, the parties do not include the facts upon which they rely in their Rule 56.1 Statements— and so, even if there was no material factual tension between the parties, neither side could prevail on this claim as a matter of law.

[9] Expeditors argues that iRobot refused Expeditors's offer to implement mitigation measures, choosing instead to speed up its transition to another company, GXO. (Def.'s Opp'n & Cross-Mot. at 16–18). But Expeditors fails to meaningfully tether this argument to any provision of the Agreement or a specific affirmative defense. (*See id.* at 40–43). In any event, there are issues of fact in dispute. While there is evidence that iRobot expedited its transition to GXO, (*e.g.*, Dep. of Charles P. Kirol ("Kirol Dep."), attached to Def.'s Opp'n & Cross-Mot. as Ex. M, Dkt. No. 47-11 at 200:9–203:6), there was some period of time before the transition was completed, (*id.* at 197:4-6). And it is unclear the extent to which iRobot's transitioning impeded Expeditors's efforts to remedy or mitigate the breach. None of Expeditors's Rule 56.1 facts speak to this issue.

### A.      Force Majeure

A force majeure clause "relieve[s] a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985).  Under New York law, "[f]orce majeure clauses are to be interpreted in accord with their purpose, which is to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties." *Constellation Energy Servs. of N.Y., Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 558 (1st Dep't 2017) (quotation omitted).  "The burden of demonstrating force majeure is on the party seeking to have its performance excused." *Phillips Puerto Rico Core*, 782 F.2d at 319.

Both sides have moved for summary judgment on this affirmative defense.  Neither side's position entitles it to judgment as a matter of law.  The Agreement provided that neither party would be responsible for delays or failures to perform to the extent they resulted from:

> causes beyond that party's reasonable control, including, by way of illustration but not limitation, fire, flood, war, epidemic outbreak, weather of exceptional severity, power failure, riots, terrorist activities, labor disputes or Acts of God ("Force Majeure Conditions").  In the event of any such Force Majeure Conditions, the impacted party shall notify the other party in writing of the delay or failure caused thereby.

(Agreement ¶ 27).  iRobot contends the force majeure clause cannot be interpreted to include cyberattacks.  (Pl.'s Mot. at 21–22).  In its view, to be enforceable the clause must list the specific excusable event, and there is no reference to cyberattacks in the relevant provision here.  (*Id.*).  But the argument is undermined by the very language of the

14

provision which contains an open-ended list: "including, by way of illustration but not limitation." (Agreement ¶ 27). "[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (quotation omitted).

iRobot contends that even if the provision was open-ended, cyberattacks are unlike the other listed examples: disasters, physical destruction of property, or large-scale societal disruptions. (Pl.'s Mot. at 22; Pl.'s Opp'n to Def.'s Mot. & Reply in Supp. of Summ. J. dated June 23, 2025 ("Pl.'s Opp'n & Reply"), Dkt. No. 48-4 at 23). iRobot's list is overly narrow. The provision includes events that do not necessarily fall neatly into iRobot's purported categories, such as "power failure," "labor disputes," and "terrorist activities." (Agreement ¶ 27). Given this disparate grouping of exemplar events, the provision could include a cyberattack.

Expeditors's position fares no better. Citing to *JN Contemporary*, it contends that the Agreement necessarily relieves it of its obligations. (Def.'s Opp'n & Cross-Mot. at 26). In *JN Contemporary*, the Second Circuit held that a force majeure clause applied to pandemic-generated delay. 29 F.4th at 123–24. But the relevant clause is not identical to the one here, and a pandemic-related event is not identical to a cyberattack (particularly in light of the Agreement's provisions relating to contingency planning), since the former is something beyond "the parties' fault or negligence." *Id.* at 124. *JN*

15

*Contemporary*—which considered something beyond a parties' control as something beyond their fault—does not compel a conclusion that a cyberattack is such an event.[10]

And there remain disputed issues of fact about whether the cyberattack here was beyond Expeditors's control. iRobot argues the cyberattack was foreseeable and Expeditors could continue to perform under the Agreement. (Pl.'s Opp'n & Reply at 20, 25). In support of that position, it relies on Expeditors's expert reports that discuss the risk of cyberattacks. (*See, e.g.*, Disclosure of Christopher Stangl, attached to Pl.'s Mot. as Ex. J, Dkt. No. 46-13 ¶¶ 20, 30 (asserting that "[i]t is not a matter of if, it is a matter of when" a company will be subject to a cyberattack and testifying that companies in the transportation sector, like Expeditors, were particularly targeted by cyber attackers in 2022)). It also cites to evidence that Expeditors was concerned about the risk of such an attack, including from an attack that could potentially shut down its entire system. (*E.g.*, 2020 SEC Form 10-K, attached to Pl.'s Mot. as Ex. T, Dkt. No. 46-24 at 17 ("Any significant disruptions to our global systems or the Internet for any reason, which could include . . . cyber-attacks . . . could have a material negative effect on our results.")). But most of this evidence is not cited in the Rule 56.1 Statement, and therefore, it cannot be the basis to grant iRobot judgment as a matter of law. (As a merits matter, it is also

---

[10] Expeditors relies on several cases decided after *JN Contemporary* that also found that the COVID-19 pandemic constituted a force majeure. None of these cases contemplate whether a cyberattack is a force majeure. Expeditors also cites to one New York case that contemplated a party's fault in a cyberattack, (*see* Def.'s Opp'n & Cross-Mot. at 27 (citing *Jetro Holdings, LLC v. Mastercard Int'l, Inc.*, 51 Misc. 3d 1217(A) (N.Y. Sup. Ct. 2016), *aff'd*, 166 A.D.3d 594 (2d Dep't 2018))), but *Jetro Holdings* did not involve a force majeure defense.

slightly off-point: recognizing the risk of something is not the same as having the ability to prevent or control its occurrence.)[11]

Expeditors, for its part, contends that the attack, a "zero-day" attack, was beyond its control because it was unlike any prior intrusion. (Def.'s Opp'n & Cross-Mot. at 32). Expeditors relies on statements from its experts, almost all of which are absent from its Rule 56.1 Statement, that cyberattacks using "a new type of malware" can be unpreventable. (*Id.* at 22 (quoting Dep. of Charles P. Kirol ("Kirol Dep."), attached to Def.'s Opp'n & Cross-Mot. as Ex. M, Dkt. No. 47-11 at 142:10-14)). But none of its facts in the Rule 56.1 Statement demonstrate that the specific attack on Expeditors was unpreventable.

And in any event, the record is not without material conflict. Expeditors argues that the malware, a variant of "LockBit 2.0," could not be prevented by state-of-the-art defensive shields used by Microsoft Defender. (*Id.* at 23 (citing McClincy Decl. ¶¶ 4–5)). But one of its experts testified that he could not state with certainty that there was no defense against this specific malware. (*See* Dep. of Richard Peters ("Peters Dep."), attached to Pl.'s Mot. as Ex. I, Dkt. No. 44-6 at 284:12-19; *see also* Peters Report, attached to Pl.'s Mot. as Ex. H, Dkt. No. 44-5 ¶ 92 (testifying that "LockBit 2.0 has been linked to

---

[11] iRobot also argues that because Expeditors could have restored its operations by paying the ransom as demanded, the breach was preventable. (Pl.'s Mot. at 25–26). But, as Expeditors points out, there was no guarantee that the attackers would have complied. (Def.'s Reply at 4–5). And whether the breach was preventable in the first place is a different question from whether it could be remedied after the fact.

numerous high-profile incidents affecting companies across different sectors.")).[12]  The

cross-motions on this defense are denied.  *See, e.g., Phibro Energy, Inc. v. Empresa De*

*Polimeros De Sines Sarl*, 720 F. Supp. 312, 319–20 (S.D.N.Y. 1989) (denying summary

judgment as to defendant's force majeure defense where questions as to whether a

shutdown due to mechanical problems was controllable or foreseeable remained for the

fact finder to resolve).

### B.      Impossibility

The impossibility defense excuses a party's nonperformance when (i) "the

destruction of the subject matter of the contract or the means of performance makes

performance objectively impossible," and (ii) the impossibility was "produced by an

unanticipated event that could not have been foreseen or guarded against in the

contract." *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153 (2d Cir.

2023) (quotation omitted).  To establish the defense, a party must show that it "took

virtually every action within its power to perform its duties under the contract." *Id.* at

154 (quotation omitted).  That is, the party seeking refuge must show that their

nonperformance was not caused by their fault. *Id.* at 153.  The same issues of fact in the

---

[12] Expeditors also argues that it is entitled to summary judgment because iRobot has offered no expert to refute its expert proof that the ransomware was unpreventable. (Def.'s Opp'n & Cross-Mot. at 36, 39).  There is no requirement that iRobot present its own expert to do so. *See, e.g., Brown v. County of Nassau*, 736 F. Supp. 2d 602, 604 (E.D.N.Y. 2010) ("Although plaintiff cross-moves . . . based on the County's failure to submit an expert report . . . the Court concludes that the absence of an expert report from the County does not prevent it from attempting to undermine the methodology and/or conclusions of the plaintiff's expert, as well as plaintiff's other evidence at trial.").  iRobot relies on testimony from the same experts to argue that preventing the attack or mitigating its impact was within Expeditors's control.

force majeure defense, namely whether the cyberattack was foreseeable and beyond Expeditors's ability to prevent, preclude summary judgment on the defense of impossibility for either side. *E.g., Clarex Ltd. v. Natixis Sec. Americas LLC*, 988 F. Supp. 2d 381, 394 (S.D.N.Y. 2013) (denying summary judgment, noting impossibility defense is "inherently fact-specific, and thus should be resolved by the jury at trial").

## III.   Additional Affirmative Defenses

### A.   Act of War and Terrorism

iRobot moves for summary judgment on the act of war and act of terrorism defenses.[13] (Pl.'s Mot. at 27). There is no evidence in the record that the February 2022 cyberattack was either an act of war or terrorism. The attack was caused by "financially motivated threat group[s]." (Mandiant Report at 111866; *see also* Peters Report ¶ 116 (same)). But there is no evidence that these groups were tied to any nation or terrorist group.[14] Nor is there any evidence suggesting whoever initiated the attack did so as an act of war or terrorism. Expeditors asks the Court to draw that inference because the attack occurred on the eve of the Russia-Ukraine war and the malware is attributable to Russia. (Def.'s Opp'n & Cross-Mot. at 5, 29). But identifying actors involved in war is

---

[13] The force majeure clause refers to "terrorist activities" and "war." (Agreement ¶ 27).

[14] Expeditors does not include any facts in support of these defenses in its 56.1 Statement. Expeditors's reliance in its briefing on facts not referenced in its 56.1 Statement, and sources not in the record, (*see* Def.'s Opp'n & Cross-Mot. at 5, 29), is improper. The declaration of their expert also speaks only in speculation—and only to the fact that it may have been a result of actions by a Russian-affiliated group. (Stangl Decl. ¶¶ 5–7). Even if credited, it does not suggest it was a terrorist event or an act of war.

not the same as suggesting the attack here was a war-related attack.  No plausible connection to Ukraine is drawn by Expeditors, or any explanation proffered as to why a cyberattack on a U.S. distribution company could advance Russia's war objectives.  Furthermore, its own experts testified that they could not attach the cause to any nation-state or terrorist organization.  (*See, e.g.*, Dep. of Christopher Stangl ("Stangl Dep."), attached to Pl.'s Mot. as Ex. K, Dkt. No. 46-14 at 38:6-12 ("Q: Can you, independently, attach UNC1543 or UNC2165 to any particular nation-state?  A: No.  Q: Can you attach UNC1543 or UNC2165 to any particular terrorist organization?  A: No.")).  iRobot's motion for summary judgment on this portion of the force majeure clause is granted.

**B.      Abandoned Defenses**

Expeditors also asserted several other defenses—the first, fifth, ninth, eleventh, and twelfth defenses—including failure to state a claim, that the claims are barred by the doctrine of frustration, and that iRobot is estopped from seeking relief based on its own breach and its failure to timely exercise contractual remedies.  (Answer at 6–7).  iRobot moves for summary judgment on these defenses and argues that they were pled in conclusory fashion with no factual support.[15]  (Pl.'s Mot. at 29).  Expeditors failed to raise any arguments in support of these defenses, and they are now deemed abandoned and dismissed.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly

---

[15] iRobot also moves for summary judgment on Expeditors's eighth and tenth affirmative defenses: that iRobot's own acts impeded Expeditors's ability to perform and that iRobot failed to mitigate damages, respectively.  (Pl.'s Mot. at 29).  As discussed *supra* p. 13 n.9 and *infra* pp. 22–23, issues of fact remain as to these defenses and iRobot's motion on these defenses is denied.

drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."); *see, e.g.*, *Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662, 2009 WL 2997382, at *9 (E.D.N.Y. Sep. 15, 2009) ("As a result of defendants' failure to oppose plaintiffs' [summary judgment] motion as to their defenses and counterclaims, the court finds that the defendants abandoned their affirmative defenses and counterclaims.").

## IV. Damages

### A. Types of Damages

iRobot claims four categories of damages: (1) retailer chargebacks, (2) transportation claims (including labor), (3) direct-to-customer shipment costs, and (4) storage and demurrage. (*See* iRobot's Initial Disclosures, attached to Def.'s Mot. as Ex. G, Dkt. No. 47-7 at 2). Expeditors argues that the Agreement excludes or limits these kinds of damages. (Def.'s Opp'n & Cross-Mot. at 47–51).

The Agreement provides that neither party will be "liable for consequential, incidental, or punitive damages." (Agreement ¶ 28). The Agreement otherwise permits recovery of general or contract damages. General damages compensate a plaintiff for "the value of the very performance promised," while consequential damages "compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 175–76 (2d Cir. 2000) (quoting 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.2(3) (1993)). Although "[t]he distinction between general and special contract damages is well defined[,] . . . its application to specific contracts and

21

controversies is usually more elusive." *Am. List Corp. v. U.S. News & World Rep., Inc.*, 75 N.Y.2d 38, 42 (1989).

The problem with the parties' respective arguments—including whether chargebacks are consequential damages or compensation for failed delivery, whether iRobot is seeking to recover lost profits, or whether transitional shipping costs to a new logistics company are recoverable—is that neither side goes into any detail about damages in their Rule 56.1 statements. Expeditors, if it sought summary judgment on the fact-laden inquiries presented, should have included *some* facts about some of these alleged damages. But they included none. And if they had, iRobot would have presumably responded with the factual support for its claims. Instead, the parties make fact-laden arguments—which amount to improper assertions because they are absent from the Rule 56.1 statements—in their briefs. The Court cannot resolve the damages issues now, because there are insufficient facts as to the damages sought, how they are categorized, and on what bases they are calculated—without which the Court cannot determine whether the damages constitute general or impermissible consequential/incidental damages. Therefore, Expeditors's motion for summary judgment to restrict the damages iRobot claims is denied.

## B. Duty to Mitigate

Expeditors separately argues that iRobot failed to mitigate damages by failing to seek a claim through its cyber-insurance policy and keeping the policy's existence from Expeditors. (Def.'s Opp'n & Cross-Mot. at 45). The insurance policy covered not only iRobot but also "[a]ny independent contractor performing services for [iRobot] under a

22

written contract" for services performed "on behalf and for the benefit of [iRobot]" and covers "loss of business income" and "extra expenses." (Insurance Policy, attached to Def.'s Opp'n & Cross-Mot. as Ex. I, Dkt. No. 47-7 at 1190–91, 1216).

There are two problems with this argument. First, while New York law adheres to the "universally accepted principle that a harmed plaintiff must mitigate damages," *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985), the duty to mitigate does not impose a specific obligation on a party as to how it must do so, *see Fed. Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 350 (2d Cir. 1986) ("[I]f the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage."). Instead, the breaching party must demonstrate that the non-breaching party "unreasonably failed to minimize damages." *Id.*

Second, Expeditors failed to establish that iRobot's actions were unreasonable as a matter of law. The only case Expeditors relies on is inapposite. *See Liciaga v. N.Y.C. Transit Auth.*, 231 A.D.3d 250, 259–60 (2d Dep't 2024) (addressing plaintiff's failure to secure insurance under the Affordable Care Act). And at least in the context of tort claims, courts have held that the duty to mitigate does not impose an obligation on the plaintiff to seek recovery from insurance. *See, e.g.*, *Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 25 F. Supp. 2d 376, 389 (S.D.N.Y. 1998) ("[I]t is plain that the duty to mitigate does not impose on a plaintiff a duty to obtain compensation from its insurers, rather than from the tortious wrongdoer which caused its injur[ies]."). Because a flawed legal

argument—that mitigation must be pursued by insurance—is the only basis on which summary judgment is sought, it is denied.

## V.    Motion to Seal

Expeditors requests to seal several filings from briefing on the cross-motions. (Def.'s Mot. to Seal at 2–3).  Specifically, Expeditors seeks sealing of: (1) portions of Expeditors's Interrogatory Answers (Exhibit E); (2) the Mandiant Report (Exhibits G and K); (3) the Peters Report (Exhibit H); (4) excerpts of Peters's deposition transcript (Exhibits I and J); (5) excerpts of Chris McClincy's deposition transcripts (Exhibits P and Q); (6) negotiation logs between Expeditors and the attackers (Exhibit V); and (7) recommendations for improvement (Exhibit FF).  The motion is denied in its entirety.

> In deciding whether to seal or unseal filed materials, a court properly conducts a three-step inquiry: First, the court determines whether the record at issue is a judicial document—a document to which the presumption of public access attaches.  Second, if the record sought is determined to be a judicial document, the court proceeds to determine the weight of the presumption of access to that document.  Third, the court must identify all of the factors that legitimately counsel against disclosure of the judicial document and balance those factors against the weight properly accorded the presumption of access.

*Giuffre v. Maxwell*, 146 F.4th 165, 175 (2d Cir. 2025) (quoting *Stafford v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 69–70 (2d Cir. 2023)).

The materials at issue are judicial documents, since they were "filed on a federal court's docket in the ordinary course of litigation" and are "relevant to the performance of the judicial function and useful in the judicial process."  *Id.* at 176 (quotation omitted); (Def.'s Mot. to Seal at 4 (conceding as much)).  "[A] strong presumption attaches to materials filed in connection with dispositive motions, such as . . . a

summary judgment motion." *Olson v. Major League Baseball*, 29 F.4th 59, 90 (2d Cir. 2022).  In light of the strong presumption of access, sealing "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Brown v. Maxwell*, 929 F.3d 41, 47 (2d Cir. 2019) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)).

Expeditors argues that the information within these exhibits would "give a bad actor a roadmap for evasion of defenses in a new attack" and "neutralize its mitigation and recovery processes." (Def.'s Mot. to Seal at 1–2).  But Expeditors does not support these conclusory contentions with any detail, let alone does it meaningfully address the relevant *Lugosch* factors.  (*Id.* at 4–8).  The fact that Expeditors suffered a cyberattack in the past does not by itself warrant sealing documents that discuss the causes of the attack, particularly when the litigation itself is about the cyberattack, and much of the information is already public in other documents that have not been sealed or redacted.

Expeditors contends that courts uniformly hold that a party's cybersecurity warrants sealing, but it relies on non-binding authority, (*see* Def.'s Mot. to Seal at 5–6 (relying largely on non-binding cases)), and in any event, sealing is not an axiomatic conclusion to be drawn by rule—it is a case-by-case determination contingent on the arguments and documents in the particular case.[16]  Expeditors has not attempted to

---

[16] The one intra-circuit case cited is unpersuasive.  In *Cimar (UK) Ltd. v. Intelerad Medical Systems*, although the court considered cybersecurity risks, these considerations were not in isolation, nor in and of themselves sufficient to warrant sealing.  *See* No. 25-CV-2308, 2025 U.S. Dist. LEXIS 69471, at *6–*8 (S.D.N.Y. Apr. 8, 2025).

make the precise showing that *Lugosch* demands.  And in requesting that entire reports be filed under seal, Expeditors failed to narrowly tailor to redact only the limited information that must be sealed to preserve higher values.  *See Susquehanna Int'l Grp. Ltd. v. Hibernia Express (Ir.) Ltd.*, No. 21-CV-0207, 2021 WL 3540221, at *4 (S.D.N.Y. Aug. 11, 2021); *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) ("[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail[.]").

Even where Expeditors seeks limited redactions, it fails to provide any detail or discussion about why that specific information warrants redaction.  For example, Expeditors seeks to redact paragraphs in its Interrogatory Answers (Ex. E) that provide a general overview of how the cyber-attackers overcame Expeditors's system, (Interrogatory Answers, attached to Pl.'s Mot. as Ex. E, Dkt. No. 44-2 ¶¶ 7, 9–10), but it is unclear how this information would potentially harm Expeditors in the future—i.e., there is no indication that the summary provides information not already known, or not otherwise disclosed in the public pleadings and briefs in this case, or how information about a prior attack would enable a new attack.  Expeditors's conclusory arguments, which take no account of the presumption of public access to judicial documents necessary to decide their summary judgment arguments, fail to meet the *Lugosch* standard.

Additionally, the Court notes—although it bears no weight in the Court's sealing decision—that many of the exhibits constitute expert reports and testimony.  In the future, at trial, these experts will testify.  And trials are public proceedings.

CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, iRobot's motion seeking dismissal of Expeditors's defenses that the claim is barred by an act of war and an act of terrorism, and its abandoned defenses, is granted. The remainder of iRobot's summary judgment motion is denied, and Expeditors's cross-motion is denied. Expeditors's motion to seal is also denied. The parties are directed to submit a joint proposed pretrial order by **April 23, 2026**, consistent with the undersigned's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:  March 24, 2026
       Central Islip, New York